Filed 2/27/23  In re N.G. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.G., a Person Coming Under the Juvenile Court Law. | No. A164962 |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. M.G., Defendant and Appellant. | (Sonoma Super. Ct. No. DEP 6144-01) |

M.G. (Mother) appeals from a judgment terminating her parental rights to her daughter, N.G., who is now two and a half years old.  She contends the trial court should not have severed her parental rights because the benefits from her relationship with N.G. outweigh the benefits that adoption, and the stability and permanence that come with it, will afford her.  Specifically, she asserts that the trial court erred in declining to apply the beneficial relationship exception to adoption as clarified by the California Supreme Court's decision in *In re Caden C.* (2021) 11 Cal.5th 614.

In *In re J.R.* (2022) 82 Cal.App.5th 526, we held that on appeal from a post-*Caden C.* juvenile court decision claiming error in declining to apply the

beneficial relationship exception to adoption, the parent must demonstrate that any claimed error was prejudicial. Mother has not shown prejudicial error in this case, and we therefore affirm.

## BACKGROUND

Mother gave birth to her first child, daughter N.G., in May 2020. Hospital staff had concerns about N.G.'s respiratory distress and mother's behavior. Mother had difficulty following and understanding their instructions about caring for N.G., and the hospital was concerned about N.G.'s safety in Mother's care, including whether mother was able to hold N.G. in a safe manner. The hospital obtained a psychiatric consult and concluded Mother did not have the capacity to make her own medical decisions and could not safely to care for N.G. due to Mother's developmental delay and low level of functioning. The services Mother was receiving from the North Bay Regional Center were insufficient to mitigate the concerns.

Based on these concerns, the Sonoma Department of Health and Human Services (Department) sought a protective warrant to detain N.G. It had ascertained that mother had special needs, developmental disabilities and diagnoses of ADHD, Anxiety Disorder NOS and Intellectual Development Disorder, and that she required constant supervision. (A subsequent report indicated that, as a youth, Mother had been evaluated and found to fall " 'within the "autism spectrum" range.' ") The Department's petition alleged that N.G. was at substantial risk of serious physical harm or illness as a result of the failure or inability of Mother to supervise or protect her adequately and due to the Mother's mental illness, developmental disability or substance abuse. After notice and a hearing, the juvenile court ordered N.G. be detained.

2

N.G. was placed in an emergency foster home. She had been taken off oxygen at the hospital but was spitting up her food and had developed a problem with feeding, which was diagnosed as "reflux." The pediatrician advised the foster mother to feed the baby less formula at each feeding and to hold her upright before and after feedings for long periods. N.G. also cried frequently at night.

The Department filed an amended petition adding an allegation about the presumed father,[1] a jurisdiction and disposition report and an addendum report. The addendum report stated that N.G. had "special needs of her own and requires intensive care and supervision day and night." On July 15, 2020, the juvenile court held a jurisdiction and disposition hearing, and Mother waived the right to trial and submitted on the Department's report. On July 22, 2020, the court sustained the petition, ordered regular visitation between Mother and N.G., entered a dispositional order for placement of N.G. in the same foster home and ordered the Department to provide reunification services to Mother consistent with the case plan.

The goal of the case plan was for Mother to show she could adequately care for N.G. by providing basic care, including "feeding, changing diapers, responding to cues, and providing a safe environment" through supervised visits, to establish a routine in providing care and to demonstrate she could arrange for childcare and comply with N.G.'s medical and developmental appointments. In addition, Mother was to show she could care for herself to promote her ability to provide adequate parenting and develop support systems with friends and family.

---

[1] Father is not a party to this appeal and will be mentioned only as relevant to Mother's case.

In an October 2020 interim report, the Department reported that N.G.'s "reflux issues continue to persist," and that "there have been a few times when [N.G.] has been choking on her saliva in the middle of the night." The foster mother had "observed [N.G.] not being able to make eye contact and she rarely smiles." At a "Well-Child check" in September 2020, "it was found that she has a right strabismus, congenital Torticollis, and motor developmental delays" and had been referred to providers of ophthalmology, physical therapy and pediatric developmental disability services. The Department observed, "[t]he fact that [N.G.] has medical needs that require constant attention and other services creates more challenges for both parents," "[t]he foster mother has spent nights awake with [N.G.] when she wakes up choking on her saliva or from reflux," and "[N.G.'s] needs are demanding; require attention and quick thinking to keep her safe." Further, the foster mother had reported "concerns about [N.G.]'s expressions of emotions that indicate that she might have other medical concerns that need to be identified."

The report observed that Mother was having virtual visits with N.G. twice a week and that at a previous supervised visit in August 2020, Mother "was nervous, unsure of herself, and needed frequent prompting from the support person." At virtual visits, Mother "does her best to engage her baby by calling her name frequently even when she is already sleeping. Sometimes [Mother] appears distracted and she misses the cues from [N.G.] when she is crying." The report further stated that Mother had difficulty understanding why the Department thought she was not able to care for her child in a safe way.

The Department provided a wide range of services to Mother, in an attempt to help her learn how to safely care for her child. And Mother tried

4

hard to do so for most of the approximately 14 months during which the Department provided her with services. But the obstacles to achieving that goal were insurmountable. Among them were Mother's significant developmental disability, which, coupled with her mental health issues, made it difficult for her to focus; grasp the seriousness of N.G.'s developmental disabilities and medical conditions and the risks they posed to N.G.'s wellbeing and indeed her survival; and retain what she learned from the service providers who coached her on how to safely hold N.G., support her head, feed her and meet her basic needs.

Mother had trouble recognizing N.G.'s cues and reacting appropriately when N.G. was at serious risk. On one occasion, Mother became scared and didn't know what to do when, having fed N.G. more than her physician recommended she receive in one feeding, N.G. began to throw up. Mother later reported she had not refrigerated the formula after opening it as she should have. On another occasion, Mother was changing N.G.'s diaper and did not notice N.G. was vomiting. Her care worker had to step in and place the baby in an upright position to unblock her airway and prevent her from choking to the point of asphyxiation. Mother was dismissive, saying, "no, you can't drown in your own vomit."

This is not to say that Mother was not making any effort. On the contrary, as we have said, she did. And she made some progress. But in the end, Mother's limitations impeded her ability to learn, understand and retain what her service providers were trying to teach her about how to keep N.G. safe and well cared for. N.G.'s needs—both medical and developmental— required a very high degree of attention and care.

In the social worker's view, Mother's own upbringing, in which her parents had minimized her developmental disability and subjected her to

physical abuse and neglect resulting in her spending her teenage years in foster care, probably contributed to Mother's own tendency to deny N.G.'s developmental delays and medical problems.

Mother also lacked the support she needed to care for N.G. because her parents, with whom she lived and spent time, worked long hours and could not be home with Mother to assist her with N.G. during the day or to provide transportation for her to N.G.'s medical and therapy providers. Further, just as they had not with Mother, they would not or could not appreciate the seriousness of N.G.'s condition and her associated needs.

Mother had limited resources other than the Regional Center that provided her assistance with her own hygiene and other needs about 50 to 80 hours each month, but lacked the capacity to provide her full-time care with N.G. While the Center's support worker helped Mother with transportation to visitation with N.G., Mother lacked transportation that would be necessary to transport N.G. to her many therapeutic and medical appointments.

Mother also had insomnia and a pattern of staying up late and sleeping until late morning, as a result of which she frequently overslept, was late to visits and missed virtual participation in N.G.'s appointments and sometimes slept through or during them. She was unwilling to take her physician's advice about over the counter medications to aid her sleep because she liked staying up late.

Mother became frustrated, perhaps understandably, by the fact that her child had been taken from her and not returned. She expressed frustration about people telling her what to do, which she did not like. By the middle of the 12-month review period, she began to lose interest in her reunification services and the caretakers who were trying to assist her. She was rude and hostile to her support worker, who quit as a result. She was

6

distracted during some virtual visits and missed three consecutive visits. Her in person visits were put on pause, initially because she had not complied with COVID protocols, and after that because there was no one to transport her to and support her during the visits.

In the report for the 12-month hearing, the Department recommended that the court terminate reunification services and schedule a hearing under Welfare and Institutions Code section 366.26[2] to determine a permanent plan for N.G.'s care. Finding that the Department had provided reasonable services; that Mother had failed to make substantive progress in resolving the issues that led to N.G.'s detention; that returning her to Mother's care would create a risk of detriment to her safety, protection, or physical or emotional wellbeing; and that there was no substantial likelihood that N.G. could safely be returned to Mother during an extended service period, the juvenile court terminated reunification services and scheduled a section 366.26 hearing. Mother's counsel filed a notice of intention to seek writ review of the decision but did not file a petition.

At the section 366.26 hearing, Mother contested the Department's recommendation but did not produce additional evidence. Her counsel argued that the court should apply the beneficial relationship exception to adoption "based on the fact that the minor is her biological child and the visits, particularly at the beginning of the case, went well." Counsel acknowledged that it became more difficult for Mother to build a relationship with N.G. and to learn to read her cues but argued this was because of the need to employ virtual visits some of the time due to COVID.

---

[2] Further statutory references are to the Welfare and Institutions Code.

After arguments by counsel for Mother, the father and the Department, the juvenile court found that while Mother loved N.G. and felt a bond with her, she did not meet the requirements for the beneficial relationship exception. The court found N.G. did not have a bond with Mother, that it would not be detrimental to N.G. to terminate Mother's parental rights and that adoption was in N.G.'s best interests.

## DISCUSSION

Mother argues that the trial court erred in applying the beneficial relationship exemption to adoption and, in particular, relied on factors that our high Court, in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), held should not be considered in analyzing the elements of the exemption.

As we explained in *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*), "[t]he sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304; see also § 366.26, subd. (b).) At that stage, 'the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.' (*In re Marilyn H.,* at p. 305.) The dependency statutes embody a presumptive rule that, after reunification efforts have failed, parental rights must be terminated in order to free a child for adoption. (*Caden C., supra,* at 11 Cal.5th at pp. 630-631.) However, the statutes provide an exception where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*J.D.*, at pp. 851-852.)

"In *Caden C.*, the Supreme Court for the first time addressed this statutory exception in a wide-ranging opinion that clarified its scope [and] disapproved a series of decisions that took too restrictive an approach to it

(*Caden C., supra,* 11 Cal.5th at p. 636, fn. 5; *id.* at p. 637, fn. 6; *id.* at p. 638, fn. 7) . . . . [¶] As summarized in *Caden C.*, 'the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.' " (*J.D.,* 70 Cal.App.5th at p. 852, quoting *Caden C.*, 11 Cal.5th at pp. 636-637.)

Caden C. also identified factors that are not a "categorical bar" to the beneficial relationship exception, including a "parent's inability to overcome the issues that led to the dependency." (*J.D.,* 70 Cal.App.5th at p. 852.) Such factors may be relevant, but " 'only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?' " (*J.D.* at p. 853, quoting *Caden C.,* 11 Cal.5th at p. 638.) "And the court explained that, in any given case, evidence of such matters could cut either way. 'A parent's struggles may mean that interaction between parent and child at least sometimes has a " 'negative' effect" on the child,' while '[c]onversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the

9

children have a " 'positive' . . . effect" on them.' " (*J.D.,* at p. 853, quoting *Caden C.,* at pp. 637-638.)

Mother contends that she provided proof of all three elements of the beneficial relationship exception to adoption, that the juvenile court "relied on [Mother's] failure to address case issues as a total bar to the application of the beneficial relationship exception" and that it considered improper factors in concluding she had failed to establish the second and third elements.

As Mother points out, the juvenile court found that she met the first element identified in *Caden C.*, finding she consistently visited with N.G. during the dependency proceedings. What Mother takes issue with is the juvenile court's findings regarding the second and third elements—"(2) a *relationship,* the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra,* 11 Cal.5th at p. 631.) Mother points to her testimony at the contested 12-month hearing about her visits with N.G.

At that hearing, she was asked what she did during visits with N.G. and said, "I talk to her. I put CoComelon for her.[3] She likes Twinkle Little Star. The foster mom has told me that she likes cartoons and stuff like that, Tom and Jerry. I talk to her, but it seems like all my workers want me to do is just put her in her stroller. And I also—she doesn't walk yet, but I was practicing walking with her, holding her hands. . . . . [¶] And I read her books. I look at her, and then when she starts crying I try to talk to her, soothe her so she calms down. And then sometimes I feed her, I give her a snack." When asked what she fed N.G., she responded, "Some crackers or sometimes apple sauce or sometimes yogurt."

_____

[3] We infer from the context of Mother's comments that CoComelon is a song or video program for children.

This testimony is relevant to the existence and quality of Mother's relationship with N.G. It certainly shows that Mother loves and cares about N.G. and suggests that she focused on N.G.'s needs when the two were together. But there is a missing element. As the court opined in *Caden C.*, courts evaluating the second element of the beneficial relationship exception "assess whether the 'child would benefit from continuing the relationship.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) "Again here, the focus is on the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations omitted.] Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. . . . [O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child."[4] (*Ibid.*)

Mother's testimony, assuming it was brought to the attention of the judge who presided over the section 366.26 hearing, focuses on her loving acts and efforts to comfort her child, but do not shed any light on the subject of whether N.G., who suffered from her own disabilities and medical conditions, bonded in any way with Mother. For example, Mother did not testify that N.G., who did not smile until fairly late in the dependency, ever smiled at

_____

[4] The court noted that "[t]rial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Caden C., supra*, 11 Cal.5th at p. 633, fn. 4.)

Mother. Mother did not describe whether by talking to N.G., singing or playing music or video programs for her, practicing walking with her, reading to her or giving her snacks soothed N.G. or had other positive effect on her. (See *Caden C.*, *supra,* 11 Cal.5th at p. 632 [" ' "positive" or "negative" effect of interaction between parent and child' " is relevant to whether child would benefit from continuing the relationship].)

Nor do other portions of the record Mother cites evince any such positive effects or bonding of N.G. to Mother. While the evidence leaves no doubt that Mother both endeavored to and did at times make progress in learning to provide basic care to N.G., even during the 12-month review period, there were difficulties in her interactions with N.G. It was reported that Mother was nervous at visits, that N.G. cried at most visits and that the crying made Mother more nervous and caused her to lose confidence in her ability to care for N.G. And the social worker described Mother's failing to recognize or accept that N.G. was vomiting and at risk of choking on one occasion.[5]

We are sympathetic to Mother, who made substantial efforts throughout most of the dependency proceedings to learn how to care for her child. But the record reflects Mother's disabilities and mental health condition, as well as N.G.'s disabilities and medical issues, posed insurmountable obstacles to N.G. developing a significant bond with Mother.

Among the other factors *Caden C.* held courts should consider in evaluating the nature and extent of the bond between the child and the parent are " '[t]he age of the child, the portion of the child's life spent in the

---

[5] Although the father shared some of Mother's challenges (such as panicking when N.G. vomited), the report noted that he was able to soothe N.G. during visits and make her feel comfortable by talking with her and holding her.

parent's custody, . . . and the child's particular needs.' " (*Caden C., supra,* 11 Cal.5th at p. 632.)  Consideration of these factors does not aid Mother's argument.  N.G. was removed from Mother's custody within three days after she was born and had been in the hands of the emergency foster caregivers since four days after her birth.  Over the 21 months they cared for her, it became apparent that N.G. had many and ongoing developmental and medical needs, requiring a wide array of therapeutic and medical services. Mother needed assistance in meeting her own needs and struggled to understand, accept and address N.G.'s needs.  She tended to deny or minimize those needs and missed cues from N.G. demonstrating her needs.

For all of these reasons, we conclude that the juvenile court did not err in finding that the bond between N.G. and Mother was insufficient under *Caden C.* to show that its continuation would benefit N.G. and that substantial evidence supports its finding that while Mother had bonded with N.G., N.G. had not bonded with her.

For the same and additional reasons, Mother did not establish the third element under *Caden C.*—that " 'termination [of Mother's rights] would be detrimental to the child due to' the relationship" such that "it would be harmful to the child to sever the relationship and choose adoption." (*Caden C., supra,* 11 Cal.5th at p. 633.)  The question here is "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

For the nearly two years of N.G.'s life during which they cared for N.G., the foster parents cared not only for her basic needs but also her extensive developmental needs and medical conditions, making and attending appointments for feeding therapy, physical therapy, ophthalmology,

audiology, neurology and developmental pediatrics. In their care, she gradually improved. The foster parents became committed to N.G., informed the Department of their desire to adopt her and became excited at the prospect of doing so. They had developed a strong bond with N.G., offered her stability and security, and were committed to attending to all of her needs.

In short, we agree with the juvenile court's statement to Mother that, "I know from the bottom of my heart that you love your daughter and you want what is best for her." But we also agree that, in the end, the stability N.G. would gain from the security afforded by adoption by the family who had cared for her since birth and showed a commitment to supporting her special needs weighed heavily on the scale in favor of adoption and, in the end, outweighed Mother's limited relationship with N.G.

Finally, we do not reach the question of whether the juvenile court erred in its assessment of the *Caden C.* factors, including by inappropriately emphasizing and relying too heavily on Mother's inability to overcome the issues that led to N.G.'s removal and to perform a parental role. Mother's failure to meet her burden to establish the second and third elements of the beneficial relationship exception render any such errors by the trial court harmless. That is, the evidence failed to demonstrate that N.G. was bonded to Mother so significantly that loss of the relationship would be detrimental to N.G. and that the benefit of continuing the relationship outweighed the stability and permanence adoption would provide N.G. Even in the absence of any inappropriate focus on Mother's inability to care for or be a parent to N.G., it is not reasonably likely that the juvenile court would have done anything other than sever Mother's rights and choose adoption.

## DISPOSITION

The judgment is affirmed.

_____

STEWART, P.J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*In re N.G.* (A164962)